**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1515-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GARY P. PRICHARD,

     Defendant-Appellant.

_____

Argued June 4, 2025 – Decided July 28, 2025

Before Judges Marczyk, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 21-12-1099 and 21-12-1100.

Kaitlin Coeli McCaffrey (Van Der Veen, Hartshorn, Levin & Lindheim) argued the cause for appellant.

Anthony J. Robinson, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Anthony J. Robinson, of counsel and on the brief).

PER CURIAM

Defendant Gary P. Prichard appeals his jury trial conviction for second-degree attempted kidnapping and fourth-degree possession of a deadly weapon for an unlawful purpose. The principal issue we address is whether the trial court issued a proper curative instruction to address a witness's inadmissible and prejudicial testimony that defendant was a member of the Pagan motorcycle gang. Following our review of the record and the applicable legal principles, we conclude the court's instruction was insufficient to cure the prejudice and, therefore, we reverse and remand for a new trial.

I.

This matter arises from an encounter that occurred on January 25, 2021, in New Brunswick. There was significant disagreement between defendant and the victim, Marilyn Contreras's, version of the events. Defendant testified he was driving home from work on the day of the incident, intending to meet his date, Zoe Capaldo, later that evening. He stated he drove down Easton Avenue, approached an intersection, and stopped at a stop sign. He explained he tried to turn left but was prevented from doing so because Contreras, a pedestrian, was crossing in front of him and stopped in the middle of the street to look at her phone. Defendant indicated he "blew" his car horn, which caused Contreras to drop her phone. He testified Contreras then picked up her phone, stood in the

2

street, and "started cursing" and screaming at him. Defendant stated as he turned left, Contreras "kicked [the] passenger rear side of [his] truck."

Defendant testified he proceeded to drive for a couple of seconds, but then "got really mad" about the encounter and turned around because he "wanted to confront [Contreras]" Defendant stated he drove around slowly, "looking to see where she was." He testified he pulled his vehicle alongside Contreras in front of a restaurant, and a verbal altercation ensued, during which defendant acknowledged "[he] was belligerent."

Defendant recounted he was a short distance from Contreras when she started approaching his vehicle. He testified he pulled out a "fake" gun from the center console and told her to "get the f[***] away from [his] car" because he believed Contreras was going to kick his vehicle again. (Emphasis added). He claimed he never aimed the gun at Contreras, but upon seeing the gun, she screamed and jumped behind a nearby pile of cardboard boxes, "which . . . was what . . . the gun was for, . . . to stop any problems from happening." He stated he then drove away.

Nicole Hodges, an employee of the restaurant near where the altercation occurred, testified she was closing the restaurant when she heard "a lot of commotion going on outside," including "some screaming." Hodges stated she

went outside and saw a woman crying and appearing "hysterical." Hodges then contacted the police, providing a description of defendant and the vehicle.

Detective Keith Walcott responded to the scene to investigate the incident and took a statement from Contreras, who reported that an individual in a red truck pulled alongside her, pointed "a black handgun at her through the open passenger side window," and twice yelled "get in the f[*****]g car," and then sped off. (Emphasis added). Detective Walcott subsequently obtained surveillance from nearby businesses, residences, and Rutgers University, which depicted defendant's vehicle. The video surveillance did not capture the actual interaction between defendant and Contreras.

A few days later, police stopped defendant in his vehicle and arrested him. Detectives obtained and executed a search warrant on defendant's vehicle and found an imitation handgun (starter pistol) loaded with blank rounds in defendant's trunk. Subsequently, defendant was charged with attempted kidnapping, N.J.S.A. 2C:5-1(a)(3) and 2C:13-1(b)(2), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(e).

At the time of defendant's arrest, he had been seeing two women, Capaldo, and Diana Perez. At trial, defendant testified he was in a non-exclusive relationship with Capaldo for about two years prior to the arrest and had met

Perez in September 2020. Defendant stated Perez's behavior changed in December when she connected with an old friend and started "doing hard drugs." Defendant indicated he was against drug use and never participated in drug activity because he lost a family member to drugs.

Against this backdrop, defendant was released from jail approximately two weeks after his arrest. Perez hired an attorney to represent defendant, and defendant resided with her following his release. According to defendant, he and Perez had several arguments concerning her use of drugs, which led defendant to move back to New Brunswick. Defendant testified that in late April 2021, he invited Perez and other people to his home. Defendant testified he and Perez got into an argument after he observed her ingest "something." Defendant stated he ended the relationship the next morning but informed Perez they could remain friends.

Defendant explained Perez would attempt to contact him and appeared at his home unannounced on Father's Day in June 2021, at which point he informed her not to call or text him anymore. Defendant testified that when he offered Perez $1,400 for gifts she had given him, she threw the money in his face and said "[he] was gonna regret breaking up with her." Defendant recalled two subsequent arguments with Perez in July and August 2021, when she showed up

at two bars he frequented, and he reiterated he did not want to be with her. Perez entered a rehabilitation facility in August 2021.

In September 2021, Perez went to the New Brunswick Police Department and provided a statement to Detective Walcott related to the pending attempted kidnapping and weapon charges against defendant. Perez stated defendant spoke with her about the incident and asked "if [she] was willing to find [Contreras] [and] offer her [$5,000 to $10,000] just to drop the case" against him. Perez also alleged defendant subsequently asked her "if [she] could find someone to get rid of this girl." Perez informed Detective Walcott that she told defendant "[she]'ll look into it," but did not intend to do so. Thereafter, defendant was charged with witness tampering, N.J.S.A. 2C:28-5(a)(2).

Following a grand jury indictment on all three counts, defendant moved to sever the witness tampering charge. Defendant argued the charge should be severed from the others due to the risk of the proceeding becoming "a trial within a trial" to expose Perez's motivations. Defendant contended there would be a substantial risk of prejudice in the underlying case because "it[ was] basically a he said/she said" case, which would be decided based on who the jury finds more credible. Defendant asserted it would be prejudicial to have to litigate the

A-1515-23

allegations of a "scorned" ex-girlfriend with drug issues—made months after the alleged incident—together with the charges involving Contreras.

After an N.J.R.E. 104 hearing, the court determined Perez's statements were admissible regarding defendant's motive with respect to the underlying kidnapping and weapons charges under N.J.R.E. 404(b) and the four-part Cofield[1] test. The court rejected defendant's argument that there would be undue prejudice if the evidence was utilized at trial because the witness tampering charge stemmed from defendant asking his ex-girlfriend to "figure out a way" to prevent the victim of the attempted kidnapping from testifying. Accordingly, the court was satisfied the Cofield prongs had been met and, therefore, denied defendant's motion to sever.

The trial commenced in June 2023. On the first day of trial, Hodges and Contreras testified about the incident, as noted above, and Contreras identified defendant as the driver of the vehicle. The State also introduced the recording of Hodges's 9-1-1 call.

On the second day of trial, the State presented testimony from Perez. She recounted her allegation that defendant wanted her to bribe Contreras to drop the charges against him. She claimed she declined to do so, and a few weeks

---

[1] State v. Cofield, 127 N.J. 328 (1992).

later, defendant asked if she could find someone to "rough . . . [Contreras] up, like[] scare her, [and] beat her up." She indicated that when she did not agree to defendant's request, he asked her if she could "find someone to kill this girl[.]" She testified that after defendant made these requests, she "locked [her]self in [her] room" and began using drugs for an extensive period of time. She stated she went to the police immediately after finishing rehab because she would use drugs again if she kept the information to herself.

Defendant's primary challenge in this appeal involves Perez's subsequent testimony where she made prejudicial comments, at times unsolicited, regarding defendant's alleged prior drug use, drunk driving history, and gang affiliation. Initially, Perez stated she did not want defendant to know she was in recovery, "let alone, do drugs in front of him," because she "knew from a close family member of his how he was so against that." However, defense counsel and Perez then engaged in the following colloquy:

> [Defense counsel:] All right. . . . [Defendant] wasn't into the whole drug scene. Fair to say?
>
> [Perez:] You're asking me –
>
> [Defense counsel:] Yeah.
>
> [Perez:] . . . I'm going to tell the truth. [Defendant] did cocaine.

[Defense counsel:] Okay. And then the next day is when he told you, this is officially over. I'm on pretrial release. You can't come anymore. It's over. And that's when you got upset. That's when the relationship went downhill.

[Perez:] No. That's –

[Defense counsel:] That was on April 25[], 2021.

[Perez:] . . . [O]kay. It wasn't that. It was the second time [defendant] called me when he got arrested, again, um, for D-W-I while on [p]robation . . . .

[Defense counsel]: Objection, Judge.

. . . .

THE COURT: Sustained.

. . . .

THE COURT: Jury . . . disregard that last answer, please.

[Perez]: Sorry.

Thereafter, defense counsel questioned Perez about her familiarity with Capaldo. Perez responded defendant "was trying for us to become friends and get together. And I made it very clear to [defendant], I will never do the threesome thing." When defense counsel inquired as to why she did not tell Detective Walcott "anything about threesomes," Perez made unsolicited remarks about defendant's affiliation with the Pagan motorcycle gang. She stated:

9

Well, what I'm saying to you is, everything that I'm speaking about here, I spoke to Detective Walcott . . . about [defendant] being a Pagan, I spoke about that. . . .

[Defense counsel]: Judge, objection. What's . . . I don't know what she's talking about?

THE COURT: . . . Sidebar.

At sidebar, defense counsel told the judge, "I am not asking her about that," to which the judge agreed and stated, "[s]he's just going crazy," "throwing a lot of stuff and now she's got him . . . ." (Emphasis added). The judge stated: "if something is objectionable, then just . . . object to it. Okay? But she wants to control this dialogue so much that now she's compromised this case three times, now with, he's a Pagan." (Emphasis added). The judge indicated "[t]hat's not . . . good," and he noted Perez's response "ha[d] nothing to do with the question," and "she just wants to put out there whatever she wants to put out there." The judge determined he would advise the jury to disregard that last answer.

Defense counsel, however, requested a mistrial, to which the judge responded, "I'm going to reserve on that."[2] The judge informed defense counsel that if he did not get the answer he wanted on cross-examination, "the objection

---

[2] The judge never ruled on the mistrial motion.

A-1515-23

is, [j]udge, non[-]responsive." The judge stated Perez has "got to get control of herself and there's no way of telling her that right now." The court rejected the State's argument that Perez was in control of herself and she answered the questions posed to her. The judge commented, "she's answering the questions kind of that [defense counsel] wants, but she's throwing extra stuff in there about . . . threesomes, he's got arrested for a [DWI], he's a Pagan member now, [and] he does cocaine." (Emphasis added).

The judge indicated "[t]his is all stuff that's way beyond the questions," and reiterated that Perez was "compromising the case." The judge stated:

> Nobody ever asked if . . . defendant does drugs? She threw that out there. That's the problem. She's . . . not listening to the questions. She wants to . . . answer the way she wants to answer. . . .
>
> You[, defense counsel,] have to ask her more precise questions and if you don't ask a precise question, she's going to answer the way she's going to answer. But if she [answers,] . . . like she's done now three times already, she might compromise this case. . . . I'm going to tell the jury to strike . . . that last answer.

When the court went back onto the record, it advised the jury, "I will need you to completely disregard that last answer given by the witness in this case. Okay?"

A-1515-23

Defendant testified on the third day of trial, disputing Contreras's version of the events. He acknowledged that turning around to confront Contreras after she kicked his truck "was probably the worst decision of [his] life" due to "everything that followed." He conceded he parked his car near Contreras and then "pulled out the gun" from his center console when she started walking toward his vehicle. Defendant testified he told Contreras to "get the f[***] away from [his] car," at which point she screamed and jumped behind the pile of cardboard boxes.

Defendant denied ever telling Contreras to get into the car and stated it would not make sense for him to say that because he had planned to meet Capaldo later that evening, and the area was heavily populated. He also denied asking Perez to bribe Contreras because he did not have any money after his release from jail. He contended Perez's allegation that he asked her to find someone to kill Contreras was "100 percent . . . made-up, delusional lies."

The jury returned a verdict finding defendant guilty of attempted kidnapping and possession of a weapon for an unlawful purpose. However, defendant was found not guilty of witness tampering.

When the State moved to revoke defendant's release pending sentencing, defense counsel objected, arguing he had asked for a mistrial because a witness

inappropriately testified defendant was a member of the Pagan biker gang. However, because the judge who presided over the trial was absent that day, the substitute judge asked if there had already been a ruling on the request for a mistrial. Defense counsel explained, "[the trial judge] ruled that . . . he wasn't going to issue a mistrial . . . at [that] time." The substitute judge then declined to "override" that decision.

Defendant was sentenced in October 2023. The court sentenced defendant to eight years' imprisonment, subject to an eighty-five percent parole disqualifier under the No Early Release Act, N.J.S.A. 2C:43-7.2, for the second-degree attempted kidnapping charge, and to one year incarceration for the fourth-degree possession of a deadly weapon for an unlawful purpose charge, to run concurrent with the sentence for attempted kidnapping.

II.

Defendant raises the following points on appeal:

POINT I

DEFENSE'S MOTION FOR MISTRIAL SHOULD HAVE BEEN GRANTED.

    a.    There is no trial court decision to afford deference.

13

POINT II

THE TRIAL COURT ERRED BY DENYING THE DEFENSE'S MOTION TO SEVER.

      a.      Relevance to Material Issue in Genuine Dispute.

      b.      Clear and Convincing Evidence.

      c.      Prejudice.

POINT III

THE TRIAL COURT'S FAILURE TO CONSIDER ANY MITIGATING FACTORS AND IMPOSITION OF A LENGTHY STATE PRISON SENTENCE CONSTITUTED AN ABUSE OF DISCRETION.

A decision to grant or deny a motion for a mistrial is left to the sound discretion of the trial judge. State v. Smith, 224 N.J. 36, 47 (2016); State v. Jackson, 211 N.J. 394, 407 (2012). "[A]n appellate court will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." Jackson, 211 N.J. at 407 (alteration in original) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). "The grant of a mistrial is an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting Harvey, 151 N.J. at 205). "Of course, declaring a mistrial is never a preferred course." State v. Smith, 471 N.J. Super. 548, 579 (App. Div. 2022). "If there is

14

'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." Smith, 224 N.J. at 47 (quoting State v. Allah, 170 N.J. 269, 281 (2002)). "For example, a curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial, depending on the facts of the case." Ibid.

"The same deferential standard that applies to the mistrial-or-no-mistrial decision applies to review of the curative instruction itself." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019) (citing State v. Winter, 96 N.J. 640, 647 (1984)). "[A] trial court is in the best position to assess the impact of an evidentiary ruling." Ibid. (citing Crawn v. Campo, 136 N.J. 494, 512 (1994)).

Defendant argues that although a trial court has discretion to declare a mistrial, no deference is warranted here because the court never formally ruled on his motion. He contends the court's "one-sentence instruction to the jury" to disregard Perez's testimony about defendant's affiliation with the Pagans did not constitute a ruling on his motion for a mistrial. Moreover, he asserts Perez's testimony about his prior DWI conviction, drug use, and membership in "a notoriously violent and criminal biker gang" was "undoubtedly prejudicial," portrayed him as a "villain," and "could not be remedied through a curative or limiting instruction."

Defendant asserts these prejudicial comments are even more severe in a "he said, she said" attempted kidnapping case because the verdict "hinged on who the jury found most credible." Specifically, according to defendant, because no witnesses or cameras observed the interaction and no surveillance cameras captured the incident, and given defendant did not dispute grabbing the imitation firearm, the "only real" issue was whether the jury believed Contreras's testimony that defendant told her to get into the vehicle, or defendant's testimony that he told Contreras to get away from his vehicle.

Defendant avers the testimony about his Pagan gang affiliation "improperly tilt[ed] the scale[s] of credibility heavily in . . . Contreras' favor," and that the jury could have been "improperly swayed" by Perez's comments. He contends it is unreasonable to believe the jurors could disregard this testimony but, even if they attempted to do so, "it would be impossible to not let this information prejudice their decision."

The State concedes Perez "volunteered" statements that were "objectively and admittedly irrelevant" and "untethered" to the questions. However, it avers Perez making "[a] few off-hand, unsolicited remarks" about defendant's history "could not have been material" because the jury considered additional testimony from several other witnesses. It further contends Perez's statements neither

16

prejudiced defendant nor improperly influenced the jury because her testimony was limited to the witness tampering count, and defendant's acquittal on that count "represents the jury's categorical disregard of Perez's testimony" on that issue and, by extension, tangential issues.

Our Supreme Court has articulated:

> The decision on whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial, is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting.
>
> [Winter, 96 N.J. at 646-47.]

"The authority is abundant that courts presume juries follow instructions." Herbert, 457 N.J. Super. at 503. Yet, "[t]here are undoubtedly situations in which notwithstanding the most exemplary charge, a juror will find it impossible to disregard such a prejudicial statement." State v. Boone, 66 N.J. 38, 48 (1974); see also Herbert, 457 N.J. Super. at 504 ("The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." (quoting Krulewitch v. United States, 336 U.S. 440, 453 (1949) (Jackson, J., concurring))).

17

In addressing an objection to an improper reference to a defendant's gang affiliation in a murder case, this court has observed that a trial court's decision "to opt for a curative or limiting instruction, instead of a mistrial or new trial, depends on at least three factors." Id. at 505. First, courts "consider the nature of the inadmissible evidence the jury heard, and its prejudicial effect." Ibid. "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Ibid. (quoting Winter, 96 N.J. at 647). "[W]hile a general charge may suffice to cure 'only slightly improper' remarks, 'a single curative instruction may not be sufficient to cure the prejudice resulting from cumulative errors at trial.'" Ibid. (quoting State v. Vallejo, 198 N.J. 122, 136 (2009)). Accordingly, "[a]n instruction can be curative only if the judicial medicine suits the ailment." Id. at 508.

The second factor recognizes that "an instruction's timing and substance affect[s] its likelihood of success." Id. at 505. The instruction must be "firm, clear, and accomplished without delay." Vallejo, 198 N.J. at 134. Our Court "has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial." Id. at 135.

18

"[A] swift and firm instruction is better than a delayed one" in order to inhibit any prejudicial evidence from cementing in the minds of the jury. Herbert, 457 N.J. Super. at 505. With respect to the substance, "a specific and explanatory instruction is often more effective than a general, conclusory one." Id. at 506.

Under the third factor, the "court must ultimately consider its tolerance for the risk of imperfect compliance." Id. at 507. Determining "whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict." State v. Macon, 57 N.J. 325, 335 (1971). However, "not 'any' possibility can be enough for a rerun of the trial. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Id. at 336.

Applying these principles to the facts presented here, we conclude the trial judge's instruction did not remedy the prejudicial impact of Perez's inadmissible testimony that defendant was a member of the Pagan motorcycle gang. The court's instruction did not "clearly and sharply address the prejudicial aspect" of the testimony. Herbert, 457 N.J. Super. at 508. The Pagan gang reference was highly inflammatory and prejudicial. The trial judge recognized the negative impact of the testimony repeatedly noting Perez "compromised" the case.

19

The <u>Vallejo</u> Court recognized "[o]ther-crimes evidence is considered highly prejudicial." 198 N.J. at 133. As this court has noted, "[a]lthough evidence of membership in a street gang is not . . . evidence of actual criminal activity, it is at the very least strongly suggestive of such activity." <u>State v. Goodman</u>, 415 N.J. Super. 210, 227 (App. Div. 2010). Consequently, "[a] 'mere . . . allegation[] of gang membership carries a strong taint of criminality.'" <u>Herbert</u>, 457 N.J. Super. at 509 (second alteration in original) (quoting <u>Goodman</u>, 415 N.J. Super. at 227). Such evidence runs the risk that "the jury may conclude [the] defendant is a bad person with a propensity to commit crimes." <u>Ibid.</u> Indeed, "[t]here is widespread agreement that other-crime evidence has a unique tendency to turn a jury against the defendant." <u>Ibid.</u> (quoting <u>State v. Stevens</u>, 115 N.J. 289, 302 (1989)).

Given the prejudicial nature of defendant's purported gang affiliation, the court's one-line instruction here was too general and conclusory to dispel its unsavory suggestion of defendant's criminal propensity. In fact, it lacked any of the specificity of the curative instruction that the trial court gave in <u>Herbert</u>, which we nevertheless found inadequate for other reasons. 457 N.J. Super. at

509-11. Moreover, it also fell far short of the detailed suggested curative instruction we set forth in Herbert.[3]

---

[3] In Herbert, we stated:

> To increase the likelihood the jurors would actually disregard the detective's statement, the judge could have explained that giving it weight would disserve the fact-finding function, and would unfairly prejudice their view of defendant. To further guard against misuse, the court should have provided a warning akin to that accompanying admissible Rule 404(b) evidence. For example, the judge could have stated:
>
> > Ladies and gentlemen, you just heard Detective Crawley mention that [the] defendant is a member of a gang. I am striking that statement, and direct you to disregard it and give it no weight whatsoever. Let me explain why.
> >
> > First, the statement is unsupported by any evidence in this case. Regardless of whether the detective actually believes what he says, his statement may be based on hearsay, or rumor, or mistaken information. It would be unfair to [the] defendant, and wrong for you to credit the detective's statement without proof, without evidence. Without proof, it is nothing more than an allegation. You are obliged to make fact-findings based not on allegations, but on the evidence presented in this courtroom, and only that evidence, in accord with the instructions I give you.

21

There has been, and will be no evidence that gangs were involved in this homicide, or [the] defendant is himself a gang member. The detective's statement by itself is not evidence.

Second, because we knew in advance that there would be no evidence in this trial to support the detective's statement, the detective was directed not to mention gangs. He did so anyway, in violation of my direction. You should disregard his statement.

Third, you must not conclude, based on the detective's unsupported statement, that [the] defendant is a bad person, or that he was more likely to commit the crimes charged based on the detective's characterization of him. The statement is unsupported and should be given no weight.

While I am on the subject, I also direct you to disregard and give no weight to the detective's statement that the neighborhood near the school is a "high gang area." The detective provided no evidence to support that statement. That statement also violated my direction that unsupported statements about gangs were prohibited. It would be unfair and wrong for you to conclude that the alleged presence of gangs in the area provided a reason for the homicide, or supported a finding that defendant committed it.

A-1515-23

Perez's testimony regarding defendant's Pagan affiliation cannot be dismissed as a fleeting comment likely to evade the minds of jurors; rather, it had the potential to remain with the jury as a strong suggestion of criminality. Indeed, like in Herbert, the trial came to a halt once Perez referenced defendant's membership in the Pagans. Id. at 508-09. Consequently, that remark—carrying a clear potential of prejudice—likely did not go unnoticed by the jury.

Although the State contends defendant's acquittal on the witness tampering offense indicates the jury "categorical[ly] disregard[ed]" Perez's testimony on all issues, this argument ignores the unrelated and irrelevant references to gang membership, which carried the taint of criminality. Moreover, "[o]ur jurisprudence does not allow us to conjecture regarding the nature of the deliberations in the jury room." State v. Muhammad, 182 N.J. 551, 578 (2005). "We will not speculate about the foundations of the jury verdict." State v. Montalvo, 229 N.J. 300, 324 (2017). We know the jury determined that the State failed to prove the jury tampering charge beyond a reasonable doubt.

---

To repeat, the statements regarding gangs are unsupported; it would be unfair and wrong if you gave them any weight; and I direct you to disregard them.

[Herbert, 457 N.J. Super. at 511 n.7.]

We cannot, however, in turn, infer that it completely disregarded Perez's testimony, particularly in light of the inadequate curative instruction. In other words, the jury may have found there was insufficient corroborating evidence regarding the witness tampering charge. However, it does not follow that the jury would wholly ignore Perez's proclaiming that defendant is a Pagan gang member.

We further determine, because of the insufficient curative instruction, the risk of the jury's non-compliance with following the court's instruction was high. This was not a case that involved otherwise overwhelming evidence of defendant's guilt. There was no video surveillance of the altercation or eyewitness testimony. Rather, the State's case depended almost exclusively on Contreras's account of the confrontation with defendant. Because defendant testified in his defense, his credibility was front and center for the jury to evaluate. Perez's unsolicited testimony regarding defendant's gang affiliation had the potential to cause substantial prejudice and the capacity to impact the jury verdict, given this case rested on the credibility of defendant and Contreras. Painting defendant as a member of a notorious biker gang—after Perez had also cast additional aspersions on defendant's character regarding drug use and a prior DWI—had the clear capacity to irremediably taint his credibility.

A-1515-23

Although we ordinarily accord deference to the trial court in ruling on a motion for a mistrial, the court never squarely addressed that motion. Moreover, while the court instructed the jury not to consider Perez's unsolicited comment regarding defendant's membership in the Pagan motorcycle gang, we conclude it was insufficient and did not cure the highly inflammatory and prejudicial impact of the testimony. Accordingly, we are constrained to reverse and remand for a new trial. Because defendant was acquitted of witness tampering, we need not address the severance issue. Because we reverse, we need not address defendant's sentence.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1515-23