**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5229-18
                    A-5707-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMIRE D. WILLIAMS,
a/k/a JAMERE WILLIAMS,
and JAH JAH,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TYSHON KELLY, a/k/a
TYSHON KELLEY,

    Defendant-Appellant.

_____

Argued November 1, 2021 – Decided December 23, 2021

Before Judges Accurso, Rose, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 17-07-0947.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant Jamire D. Williams (Joseph E. Krakora, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Catherine J. Djang, Designated Counsel, argued the cause for appellant Tyshon Kelly (Joseph E. Krakora, Public Defender, attorney; Catherine J. Djang, on the briefs).

Melinda Harrigan, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lori Linskey, Acting Monmouth County Prosecutor, attorney; Maura K. Tully, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

These two appeals, calendared back-to-back and consolidated for purposes of our opinion, arise from a single Monmouth County indictment charging defendants Jamire D. Williams and Tyshon Kelly with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count one), and fourth-

2

degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(f) (count two).[1]

Williams also was charged in count three with fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a).

The charges ensued from a motor vehicle stop by local police on a cold winter evening in late December 2016. Deal Police Officer Jeffrey Kless stopped the car after a random license plate query revealed the driver's license of the car's registered owner – a woman – was suspended. At the time of the stop, only two men occupied the car: Williams, the driver; and Kelly, the front seat passenger.

Upon approaching the car, Kless smelled raw marijuana and called for backup to confirm his suspicions. Officer Daniel Lokerson arrived with his canine partner, who alerted for the presence of narcotics. Williams protested the search; Kelly called the car's owner in an effort to have her respond. Body cameras worn by the arresting officers captured their on-scene encounters with defendants.

---

[1] In addition, both defendants were charged by complaint-summons with unlawful possession of less than fifty grams of marijuana, N.J.S.A. 2C:35-10(a)(4). A disorderly persons offense at the time of their arrest, effective February 22, 2021, this subsection has been decriminalized. After the jury was dismissed, the trial judge found defendants not guilty of the charge.

A-5229-18

The warrantless search of the car resulted in the seizure of a .22 semi-automatic pistol, loaded and cocked with hollow point bullets; a small quantity of marijuana; two ski masks; and a multitude of non-contraband items. Williams ran from the scene but was stopped by the canine unit in a nearby stream.[2] Kelly was arrested without incident.

Contending only that the motor vehicle stop was invalid, defendants moved pretrial to suppress the evidence seized from the car. Following denial of their motion, the matter was scheduled for trial before another judge. Pertinent to this appeal, the trial judge denied defendants' motions in limine to: redact Williams' statements that were recorded on the body camera video, protesting the search; and sanction the State for failing to provide transcripts of the body camera audio. Upon the State's representation that it would refrain from moving the ski masks into evidence, the judge denied as moot defendants' motion to bar the introduction of that evidence or any reference to it.

During defendants' joint jury trial, the State presented the testimony of five law enforcement witnesses and introduced in evidence partially redacted audio-video recordings from the body cameras worn by Kless and Lokerson at

---

[2] Although most references in the record indicate the masks were found in the car, on at least one occasion, Kelly's trial counsel advised the trial judge that one ski mask was found along the path taken by Williams en route to the stream.

the time of the incident. After Kless mentioned the ski masks on direct examination, the judge immediately issued a curative instruction and thereafter denied defendants' motion for a mistrial. Defendants neither testified nor called any witnesses.

The jury convicted both defendants of unlawful possession of a weapon, acquitted them of possessing a defaced weapon, and convicted Williams of resisting arrest. After granting the State's motion for a mandatory extended term, the trial judge sentenced Williams to a fifteen-year prison term with a parole disqualifier of seven and one-half years pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), on the weapons charge and a concurrent prison sentence of eighteen months for resisting arrest. The judge granted the State's motion for a discretionary extended term and sentenced Kelly to the same prison term on count one.

On appeal, defendants challenge their convictions, raising the following substantially similar points, which we renumber for the reader's convenience:

POINT I

BECAUSE OFFICERS COULD IMMEDIATELY RECOGNIZE THAT THE DRIVER OF THE CAR WAS NOT THE REGISTERED OWNER, IT WAS UNREASONABLE AND UNLAWFUL FOR POLICE TO SEIZE THE CAR AND ITS OCCUPANTS ON THE BASIS THAT THE REGISTERED OWNER

HAD A SUSPENDED LICENSE. ALTERNATIVELY, THE OFFICERS LACKED REASONABLE SUSPICION INDEPENDENT OF THE SUSPECTED MOTOR VEHICLE OFFENSE TO CONDUCT A CANINE SNIFF.
[(Partially raised below)]

POINT II

OFFICER KLESS'S REFERENCE TO THE EXCLUDED SKI MASKS IN CONJUNCTION WITH THE HANDGUN FOUND IN THE CAR WAS IRREPARABLY PREJUDICIAL, AND THE TRIAL COURT ERRED IN DENYING [DEFENDANTS'] REQUEST FOR A MISTRIAL. MOREOVER, THE TRIAL COURT'S BARE-BONES CURATIVE INSTRUCTION WAS INADEQUATE, AND THE TRIAL COURT SHOULD HAVE GRANTED WILLIAMS'S APPLICATION FOR A MORE DETAILED INSTRUCTION.

POINT III

THE TRIAL COURT COMMITTED PLAIN ERROR BY CONTRADICTING THE BEYOND-A-REASONABLE-DOUBT STANDARD AND INSTRUCTING THAT THE JURORS COULD CONVICT IF THEY INFERRED THAT POSSESSION WAS "MORE PROBABLE THAN NOT." U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, ¶ 1.
[(Not raised below)]

Williams separately seeks reversal of his convictions on two additional

grounds:

6

THE NUMEROUS REFERENCES, OVER DEFENSE OBJECTION, TO . . . WILLIAMS'S REFUSAL TO CONSENT TO THE CAR SEARCH IS REVERSIBLE ERROR BECAUSE IT INVITED THE JURY TO INFER – AND BECAUSE THE PROSECUTOR AFFIRMATIVELY TOLD THE JURY TO INFER – CONSCIOUSNESS OF GUILT.
[(Partially raised below)]

POINT V

THE TRIAL COURT ERRED IN HOLDING THAT THE STATE WAS NOT OBLIGATED TO PROVIDE TRANSCRIPTS OF THE BODYCAM FOOTAGE CONTAINING THE RECORDED STATEMENTS OF . . . WILLIAMS, HIS CO[-]DEFENDANT, AND TESTIFYING OFFICERS.  BECAUSE THE STATE'S CASE RELIED ENTIRELY ON THE CONTENT OF THE FOOTAGE IN PROSECUTING . . . WILLIAMS, THIS ERROR WAS REVERSIBLY PREJUDICIAL.

Alternatively, defendants raise separate points, claiming their sentences are excessive.  More particularly, Williams argues:

POINT VI

THE TRIAL COURT GAVE UNDUE WEIGHT TO THE SOCIAL PROBLEM OF GUNS GENERALLY IN GIVING DEFENDANT A FIFTEEN[-]YEAR SENTENCE FOR THE CONSTRUCTIVE POSSESSION OF A HANDGUN.

And Kelly raises the following point:

POINT VII

THE DISCRETIONARY EXTENDED TERM FOR
GUN POSSESSION – FIFTEEN YEARS WITH A
SEVEN-YEAR AND SIX-MONTH PAROLE
DISQUALIFIER – WAS EXCESSIVE.

We are not persuaded by the arguments raised in points I through VI and, therefore, affirm the convictions and Williams's sentence. We also are not persuaded that the trial judge erred in the imposition of Kelly's sentence, but we nevertheless remand his sentence for further consideration in light of the Supreme Court's opinion in State v. Pierce, 188 N.J. 155 (2006).

I.

We commence our review with defendants' common arguments, raised in points I through III.

As they did before the motion judge, defendants maintain Kless lacked reasonable suspicion to stop the vehicle and, as such, all evidence seized from the car must be suppressed. For the first time on appeal, defendants argue that even if the stop was valid, the canine sniff of the vehicle violated their constitutional rights by improperly prolonging the stop. Defendants' contentions are unavailing.

During the August 16, 2018 suppression hearing, the State presented the testimony of Kless and Lokerson and introduced into evidence their body

8

camera videos from the incident. Defendants did not testify or call any witnesses; they moved a few photographs into evidence.

Kless explained the events that led to the stop and seizure. On December 21, 2016, Kless was parked along the shoulder of Norwood Avenue in Deal in his marked police vehicle, conducting random queries of passing cars by entering their license plate characters into his onboard computer. Around 7:21 p.m., Kless's query of a gray Nissan revealed the driver's license of the registered owner was suspended. The computer identified the owner as Willande Lavarin, a twenty-eight-year-old woman, who was five feet, seven inches tall, and weighed between 181 and 225 pounds.

Kless pursued the Nissan, which was traveling about thirty-five miles per hour, and appeared to run a red light at the intersection of Norwood and Brighton Avenues.[3] Because it was dark, Kless was unable to observe the Nissan's driver while in pursuit. Kless activated his overhead emergency lights and the Nissan pulled over just south of the intersection without incident.

---

[3] Because the motor vehicle recording later revealed Williams had not run the red light, Kless voided the traffic summons he had issued for that violation. During her closing argument, the prosecutor advised the motion judge that even though the motor vehicle stop was not based on a red-light violation, "it [wa]s something to consider in the totality of the circumstances."

Upon approaching the passenger's side of the Nissan, Kless introduced himself, and Williams apologized for "trying to beat the light." Williams produced his driver's license and the car's registration, but defendants could not locate a valid insurance card. Defendants called Lavarin, who indicated she would respond with the insurance card. Because Lavarin's license was suspended, Kless told her not to drive. Kless believed he "detected the odor of marijuana emanating from the vehicle," but he was unsure because his nose was congested. Kless called a senior officer to the scene for a second opinion on the marijuana odor. Defendants remained in the car while a warrant and criminal history check of Williams revealed a narcotics and firearms record. "Within five minutes," Lokerson arrived with his canine partner.

Lokerson testified that upon approaching the Nissan, he did not detect the odor of marijuana, but noticed multiple air fresheners throughout the car and a metal spoon with white residue in the center console. Williams appeared "nervous; he was . . . shifting in his seat [and] . . . wasn't making eye contact." Kelly "was staring straight ahead"; he was not interacting with Lokerson.

Based upon these circumstances, police asked defendants to exit the vehicle while Lokerson conducted a canine search of the exterior of the car. The canine alerted for the presence of narcotics at both the driver's side window and

10

passenger's side door. The ensuing canine sniff of the car's interior resulted in a positive indication of narcotics under the front passenger seat. Police seized a bag of marijuana from that area. Police later recovered the loaded handgun under the driver's seat. Williams became increasingly agitated as the search was conducted, protesting law enforcement's authority for proceeding with the search in the owner's absence.

Following summations, the motion judge reserved decision. On August 31, 2018, the judge issued a written opinion, squarely addressing the issues raised in view of the governing law. Crediting the testimony of both officers, the judge's detailed factual findings concerning the propriety of the stop were supported by the record evidence.

Citing this court's decision in State v. Pitcher, 379 N.J. Super. 308, 314 (App. Div. 2005), the judge correctly recognized "license plate checks followed by motor vehicle stops based on reasonable suspicion that the driver's license is suspended are constitutionally permissible." Id. at 314. Further, law enforcement may conduct a license plate check randomly, "without any prior reasonable suspicion of a violation of the motor vehicle laws." Id. at 314-15.

In reaching his decision, the motion judge rejected defendants' argument that "Kless should have confirmed the identity of the driver before effectuating

11

a stop of the motor vehicle," finding their reliance on State v. Davis, 104 N.J. 490 (1986), misplaced. Noting Davis requires an officer to "use[] the least intrusive investigative techniques reasonably available to verify or dispel his suspicion in the shortest period of time reasonably possible," id. at 504, the judge found our State's case law does not require an officer to verify the driver's identity before effectuating a random stop pursuant to a license plate query.

In any event, the motion judge found Kless lacked the opportunity to ascertain the owner's identity prior to stopping the Nissan in view of the circumstances presented. The judge elaborated:

> Officer Kless testified that when he ran the query of [the Nissan] on the evening of December 21, 2016, that it was dark outside and he was unable to observe who was driving the vehicle or even whether there was more than one occupant in the vehicle. Moreover, Officer Kless testified that his vehicle was positioned on the side of the road facing the same direction that [the Nissan] was traveling. [The Nissan], therefore, came up from behind Officer Kless' vehicle and he did not have the opportunity to view the driver of the vehicle.

Accordingly, the judge concluded the motor vehicle stop was valid.

Noting defendants did not challenge the validity of the search,[4] the motion

---

[4] We glean from the record that law enforcement obtained a search warrant for the Nissan's trunk after the handgun was recovered from the car's cabin. Defendants have not asserted – before the motion judge or this court – that police

judge nonetheless upheld the exterior and subsequent interior canine sniffs, and the seizure of contraband. Relevant to defendants' belated claims on appeal, having concluded the motor vehicle stop was valid, the judge found the canine sniff was not a search "trigger[ing] constitutional protections" under State v. Dunbar, 229 N.J. 521, 538 (2017), because the sniff did not prolong the traffic stop "beyond the time required to complete the stop's mission," id. at 540. Crediting Kless's testimony, the judge found Lokerson arrived on the scene five minutes after the Nissan was stopped; referencing the time stamp on Kless's body camera video, the judge further noted the canine sniff was then completed within seven minutes. The judge found that "extremely brief period of time" did not "unreasonably prolong the stop."

Alternatively, the judge found that "even if the canine sniff could be deemed to have prolonged the stop" police nonetheless established "reasonable and articulable suspicion that narcotics were present to warrant continued detention to conduct the sniff." That suspicion was supported by Lokerson's

---

lacked probable cause or exigent circumstances to search the car before the warrant was issued. See State v. Witt, 223 N.J. 409, 447 (2015) (authorizing a warrantless search of an automobile if: "police have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous").

observations upon approaching the Nissan: multiple air fresheners; a metal spoon with white residue; and "Williams shifting nervously." Lokerson's observations, in view of his training and experience, suggested the presence of narcotics in the car.

On appeal, defendants reprise their argument that the stop was invalid because Kless was unable to ascertain Lavarin was driving the Nissan before conducting the stop. In a new argument, not presented to the trial court, defendants challenge the propriety of the canine sniff, asserting police improperly prolonged the stop. More particularly, defendants now contend because Kless immediately realized upon approaching the car that Lavarin was not the operator, Kless improperly prolonged the stop by requesting Williams's credentials, conducting a criminal background check, and requesting a second opinion on his purported detection of the odor of marijuana. Finally, defendants challenge the State's counter-argument that Kless's visual and olfactory observations were made contemporaneously when he approached the Nissan. In that context, defendants alternatively argue a remand is warranted because the motion judge failed to make specific findings as to the sequencing of Kless's observations upon approaching the Nissan.

14

Our review of a trial judge's decision on a motion to suppress evidence is "highly deferential." State v. Gonzales, 227 N.J. 77, 101 (2016). We must uphold a trial court's factual findings, "regardless of whether the evidence is live testimony, a videotaped statement, or documentary evidence" if they are supported by sufficient credible evidence in the record. State v. S.N., 231 N.J. 497, 514 (2018). We do so "because those findings are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Gamble, 218 N.J. 412, 424-25 (2014) (internal quotation marks omitted). "We owe no deference, however, to conclusions of law made by trial courts in suppression decisions, which we instead review de novo." State v. Sencion, 454 N.J. Super. 25, 31-32 (App. Div. 2018); see also Dunbar, 229 N.J. at 538.

Having considered defendants' reprised contentions in view of the applicable law and the motion record, we affirm the motor vehicle stop substantially for the reasons stated by the motion judge. Because our review is generally limited to matters "presented to the trial court," and thereby "preserved for appellate review," Witt, 223 N.J. at 419, we decline to address defendants'

belated contentions that the stop was unreasonably prolonged, and the ensuing motor vehicle search was invalid.[5] We add the following comments.

It is axiomatic that "[a]s a general rule, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." State v. Dickey, 152 N.J. 468, 475 (1998) (internal quotation marks omitted). A "brief traffic stop [also] is constitutionally permissible under a less stringent standard." Pitcher, 379 N.J. Super. at 314. "A police officer is justified in stopping a motor vehicle when he has an articulable and reasonable suspicion that the driver has committed a motor vehicle offense." Ibid. (internal quotation marks omitted). Reasonable suspicion also may arise where a random license plate check reveals the registered owner's license is suspended. See State v. Donis, 157 N.J. 44 (1998).

_____

[5] We recognize defendants' assertions on appeal – that upon approaching the Nissan and observing a female was not behind the wheel, Kless impermissibly prolonged the stop by requesting Williams's credentials, running a background check and calling Lokerson to confirm whether he too, detected the odor of marijuana – may have been a close call. But those issues were not raised before the motion judge and, as such, they were not preserved for our review. See Witt, 223 N.J. at 419. Accordingly, the State "was deprived of the opportunity to establish a record that might have resolved the issue through a few questions to [the o]fficer," ibid., during the suppression hearing. Indeed, at trial, Kless clarified that "immediately, on [his] initial approach of the passenger side of the vehicle [he] was met with an odor of raw marijuana emanating from the vehicle."

In Donis, our Supreme Court upheld the constitutionality of law enforcement's utilization of a mobile data terminal to conduct a random query of a license plate. Id. at 54-55. Although the officers subsequently "determined through a 'match-up' that the drivers were the registered owners," the Court nonetheless held the initial random query indicating their licenses were suspended "itself gave rise to the reasonable suspicion that the vehicle was driven in violation of the motor vehicle laws and was in itself sufficient to justify a stop." Id. at 58. See also Pitcher, 379 N.J. Super. at 318 (recognizing a "license suspension is simply factual information that leads to a suspicion of a violation of the motor vehicle laws, i.e., one articulable fact").

Relying on dicta in the United States Supreme Court's decision in Kansas v. Glover, 589 U.S. ___, 140 S. Ct. 1183 (2020), defendants urge us to "re[e]valuate" our Supreme Court's decision in Donis.[6] Specifically, defendants contend police should be required to obtain a "visual" of the driver after a random license plate inquiry reveals the registered owner's license is suspended.

Decided nearly two years after the motion judge rendered his decision in the present case, the Court in Glover held that a stop based on a license plate

---

[6] Defendants also cite articles that were not presented to the motion judge. As such, the material is inappropriate for consideration on appeal. See Zaman v. Felton, 219 N.J. 199, 226-27 (2014).

check revealing a registered owner's license is revoked is reasonable even when the "officer lacks information negating an inference that the owner is the driver." 140 S. Ct. at 1186. Defendants in the present case, however, cite the concurring opinions filed by Justices Kagan and Ginsberg, who would reach a different result if the driver's registration had been suspended and not revoked, reasoning "Kansas suspends licenses for matters having nothing to do with road safety, such as failing to pay parking tickets, court fees, or child support." Id. at 1192. Further, defendants cite Justice Sotomayor's dissent, disfavoring the majority view, which "absolve[s] officers from any responsibility to investigate the identity of a driver where feasible." Id. at 1196. (Emphasis added).

Because we are bound by our Supreme Court precedent – and because it is not clear Glover calls into question the validity of Donis – we decline defendants' invitation to depart from the principles enunciated in Donis and its progeny. Kless's random license plate query revealed Lavarin's driver's license was suspended. Accordingly, "that information [wa]s sufficient to give rise to a reasonable suspicion that the vehicle [wa]s being driven in violation of the motor vehicle laws and to warrant a stop of the vehicle." Pitcher, 379 N.J. Super. at 314-15. Further, as the motion judge found, it was not feasible for Kless "to confirm the identity of the driver" on the dark December evening.

Given those circumstances, we discern no basis to disturb the motion judge's conclusion that the stop was reasonable. The stop was reasonable under the Court's decision in <u>Donis</u>, and its progeny.[7]

## II.

In point II, defendants argue the trial judge erroneously failed to grant their motion for a mistrial after Kless mentioned the ski masks on direct examination. They further contend the judge's immediate curative instruction was insufficient. We disagree.

At issue is the following brief exchange after Kless explained he was processing defendants on the drug charges at headquarters, while other officers remained at the scene completing their search of the Nissan:

> PROSECUTOR:   And what if anything did you learn about that search?

---

[7] Moreover, although the State only relied on the red light violation to support its "totality of the circumstances" argument, there was ample evidence in the record that at the time of the stop, Kless believed Williams had run a red light. Indeed, Williams "apologized" to Kless, stating "he was trying to beat the light." Believing a traffic violation had occurred, Kless's decision to stop the Nissan also gave rise to reasonable suspicion to stop the car. <u>Dickey</u>, 152 at 475; <u>see also</u> <u>State v. Locurto</u>, 157 N.J. 463, 470 (1999) (noting the State is not required to prove that the motor vehicle violation occurred to meet the standard of reasonable suspicion); <u>State v. Williamson</u>, 138 N.J. 302, 304 (1994) (recognizing "the State need prove only that the police lawfully stopped the car, not that it could convict the driver of the motor-vehicle offense").

A-5229-18

KESS:  That a further search revealed a handgun was recovered, as well as two ski masks.

PROSECUTOR:  And what did you . . .

WILLIAMS'S COUNSEL:  Objection Your Honor.

THE COURT:  Yes.  Jury will disregard any reference in the officer's testimony to ski masks.  Is that clear?  It is not part of this record.  Expunge it from your memory.  It cannot be considered by you.  Do you understand that?

At the conclusion of Kless's testimony, defendants again moved for a mistrial.  Alternatively, (1) they sought an N.J.R.E. 104(a) hearing to determine the cause of the State's noncompliance with the judge's order that barred any mention of the ski masks; and (2) Williams moved for a more specific instruction, advising the jurors "not to consider" the reference "when [they] don't even know what [the ski masks] look like."  The judge denied these applications in their entirety.

After the jury's verdict, defendants moved for a new trial, based partly on Kless's reference to the ski masks, arguing they were entitled to relief pursuant to our decision in State v. Herbert, 457 N.J. Super. 490 (App. Div. 2019).  In Herbert, we reversed the defendant's convictions for murder and weapons offenses where the lead detective, in violation of a prior court ruling, referenced the defendant's alleged gang membership and the presence of gangs in the area

20

of the homicide.  Id. at 512.  Importantly, we determined the references to gang membership impermissibly suggested to the jury that the defendant was "a bad person with the propensity to commit crimes."  Id. at 509.

We further observed:  "Each time the detective referred to gangs, the trial came to an abrupt halt.  The second time, when the detective called the defendant a gang member, the jury gasped, according to defense counsel at sidebar."  Id. at 508-09.  Under those particular circumstances, and because the curative instruction was otherwise inaccurate, we concluded the instruction was insufficient to alleviate the prejudice caused by the detective's remarks.  Id. at 509-10.

Denying defendants' motion for a new trial in the present matter, the trial judge distinguished the facts in the present matter from those in Herbert.  The judge elaborated:

> While in Herbert there were multiple instances of improper testimony regarding alleged gang membership, here the ski masks located in the vehicle were mentioned only once in passing.  Additionally, there is a more direct connection between gang membership and criminal activity than there is between the more attenuated connection between ski masks and criminal activity, as there is nothing inherently criminal or illegal about owning or possessing ski masks.
>
> Based on the facts of the present case as well as the nature of the improper testimony presented, the

A-5229-18

court found then, and finds now, that a curative instruction was sufficient to mitigate any potential prejudice caused by the improper testimony about ski masks. Again, the ski masks were mentioned only once in a fleeting reference, and the mention of the ski masks was not inherently or overly . . . prejudicial to warrant a new trial.

The court will assume that the jurors followed the curative instruction provided and that the instruction was sufficient to mitigate any potential prejudice.

On appeal, defendants reprise their reliance on our decision in Herbert. Again, defendants' argument is misplaced.

Indeed, in Herbert, we did not overrule well-established principles enunciated by our Supreme Court. When inadmissible testimony is inadvertently admitted in evidence at trial, the decision to give a curative instruction or grant the "more severe response of a mistrial" is "peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." State v. Winter, 96 N.J. 640, 646-47 (1984). "Even in the context of a constitutional error, a curative instruction will not be deemed inadequate unless there is a real possibility that the error led the jury to a result it otherwise might not have reached." State v. Scherzer, 301 N.J. Super. 363, 441 (App. Div. 1997).

We review the denial of a mistrial for an abuse of discretion. State v. Smith, 224 N.J. 36, 47 (2016). Absent a manifest injustice, we will not disturb the trial court's decision, particularly where, as here, a curative instruction is an appropriate remedy, State v. Jackson, 211 N.J. 394, 409-10 (2012), and is "firm, clear, and accomplished without delay," State v. Vallejo, 198 N.J. 122, 134 (2009). See also Herbert, 457 N.J. Super. at 505-06 (reiterating the principle that "a swift and firm instruction is better than a delayed one").

Reviewing the curative instruction issued in this case, we are satisfied it was sufficient to cure any possible prejudice to defendants. Kless's reference to the ski masks – although clearly improper – was fleeting and inconsequential. Indeed, the remark was uttered midway through his lengthy overall testimony, which spanned about eighty transcript pages and preceded the testimony of four other trial witnesses. Further, as the trial judge correctly stated, unlike gang membership, there is nothing "inherently criminal" about ski masks. That is particularly true on a cold December evening.

Moreover, the curative instruction issued was swift and pointed. The trial judge clearly referenced Kless's comment, firmly instructing the jurors to disregard the improper testimony in their deliberations. As the judge aptly

concluded: "We presume the jury followed the court's instructions." State v. Smith, 212 N.J. 365, 409 (2012).

Under these circumstances, we conclude the trial judge properly denied defendants' motion for a mistrial and gave an effective curative instruction instead. State v. Allah, 170 N.J. 269, 281 (2002) (a mistrial is not appropriate if there is "an appropriate alternative course of action").

## III.

For the first time on appeal, defendants contend the judge's jury instruction on the possession of a firearm in a vehicle, N.J.S.A. 2C:39-2, "is constitutionally infirm" because it lessens the State's burden of proving defendants' knowingly possessed the .22 caliber pistol beyond a reasonable doubt. We are unpersuaded.

The statute provides, in relevant part:

> When a firearm . . . is found in a vehicle, it is presumed to be in the possession of the occupant if there is but one. If there is more than one occupant in the vehicle, it shall be presumed to be in the possession of all. . . .

To save the statute from unconstitutionality for shifting the burden of proof to a defendant on an element of the offense, the statutory "presumption" can be deemed no more than an inference which the jury may be permitted to draw "if it is more likely than not that the facts proven point to the fact inferred."

24

State v. Humphreys, 54 N.J. 406, 412 (1969) (internal quotation marks omitted). "A statute which purports to permit an inference of one essential fact from proof of another can have no probative force independent of the factual context in which it is applied." Id. at 412-13. When a statute "establishes a presumption with respect to any fact which is an element of an offense, it has the meaning accorded to it by the law of evidence." N.J.S.A. 2C:1-13(e); see also N.J.R.E. 303(b) (barring a judge from directing a jury to find a presumed fact against the accused and permitting the existence of the presumed fact to be submitted to the jury "upon proof of the basic fact but only if a reasonable juror on the evidence as a whole, including the evidence of the basic fact, could find the presumed fact beyond a reasonable doubt").

Thus, in Humphreys, the Court instructed: "The jury must be carefully informed that an inference of one fact from another is never binding; the use of the term 'presumptive evidence' could have been misleading in the present case." 54 N.J. at 415; see also State v. Ingram, 98 N.J. 489, 497 (1985) (reiterating "[t]he ultimate test of any [presumptive] device's constitutional validity remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt").

A-5229-18

The model jury charge has been tailored to meet the requirements set forth by the Court in Humphreys. See Model Jury Charges (Criminal), "Possession of Firearms, Weapons, Destructive Devices, Silencers or Explosives in a Vehicle (N.J.S.A. 2C:39-2)" (approved Mar. 30, 1993). As defendants acknowledge, the trial judge's instruction tracked the model jury charge, which the judge issued as follows:

> I had previously instructed you concerning your consideration of circumstantial evidence presented in this case, that is you may infer a fact from other facts in the case if you find it more probable than not that the inferred fact is true.
>
> Now evidence has been presented that a handgun . . . was found in a vehicle.
>
> If you find that the vehicle had more than one occupant, you may infer that the handgun was possessed by all of the occupants, again subject to the definition of possession, as I previously provided to you.
>
> You are never required or compel[led] to draw any inference. It is your exclusive province to determine whether the facts and circumstances shown by the evidence, support any inferences and you are always free to accept or reject them, if you wish.

The judge also instructed the jury:

> Where a defendant is one of the persons found in the area where a weapon, such as a handgun is discovered, you may not conclude, without more, that

26

the State has proven beyond a reasonable doubt that he had possession of the handgun, unless there are other circumstances tending to permit such an inference to be drawn.

Such evidence can include, but is not limited to placement and accessibility of the handgun. Defendant's access to and connection with the place where the handgun was found. His proximity to the place where the handgun was found, and any other evidence deemed part of the totality of circumstances.

In summary, the State must prove more than defendant's mere presence at the time that the handgun was found. There must be other circumstances tying defendant to these items in order for the State to prove constructive possession beyond a reasonable doubt.

The judge never gave a contrary instruction stating or in any way suggesting that the jurors were bound to find the inference or to view it favorably. We are satisfied from the jury instructions as a whole that the jury was adequately informed that the inference was permissive and that they were not bound to find it. Our conclusion is bolstered by the failure of both defense attorneys to object to the charge. See State v. Macon, 57 N.J. 325, 333 (1971).

Because there was no objection to the charge at trial, we will not reverse based upon any error in the charge unless the defendant demonstrates plain error, namely that which is "clearly capable of producing an unjust result." R. 2:10-2. A jury charge that tracks the language of the governing statute, and which is

consistent with the applicable model jury charge, is not plainly erroneous. See State v. Rodriguez, 365 N.J. Super. 38, 53-54 (App. Div. 2003). We discern no error, let alone plain error in the trial judge's instruction here.

IV.

We turn to the remaining challenges to Williams's convictions, raised solely by him on appeal. In point IV, Williams argues his oral statements to police protesting the stop should have been redacted from the officers' body camera footage. Citing our decision in State v. Tung, 460 N.J. Super. 75 (App. Div. 2019), – decided nearly one year after the trial in this matter – Williams claims the admission of his objections to the search improperly infringed on his right to a fair trial.

The issue was partially raised before the trial judge during argument on several in limine motions the day before jury selection. Prior to the hearing, the State sought a ruling that defendants' oral statements to police at the scene were made voluntarily. During the hearing, the State played the body camera footage in open court. Thereafter, Williams argued his statements concerning the search were irrelevant, confusing, and prejudicial. Kelly argued the footage should be introduced in its entirety, but without audio.

The prosecutor countered that defendants' "demeanor," "actions," and "responses" "to what they see happening"; and their attempt to convince Lavarin to respond "expeditiously" to the scene evinced their "consciousness of guilt." The prosecutor argued defendants "ma[d]e every single attempt to try and stop that search." The trial judge found the statements were not the product of police interrogation; were voluntarily made; and satisfied "the low threshold for relevance under [N.J.R.E.] 401."

On appeal, Williams claims his "multiple explicit invocations" of his constitutional rights were improperly introduced through the body camera footage and commented upon by the prosecutor during her opening and closing statements. To support his argument, Williams cites the following exchange:

> KLESS: So, what we're going to do right now is our canine officer is going to complete sniff car [sic].
>
> WILLIAMS: You are going to have to get consent from the owner because . . .
>
> LOKERSON: We don't need consent to run the dog around the exterior. If he hits on the car, we're going to search it.

Williams also references his discussion with Kless, while the officer was attempting to place Williams in the patrol car:

> WILLIAMS: What you mean? I'm not giving you consent to search.

KLESS:  Yeah, but you don't have to give me consent.

WILLIAMS:  Yes, I do.

KLESS:  No, you don't.  Do you see (inaudible) and sat down then went inside the car.  That's the consent.  That's (inaudible).

WILLIAMS:  That's bullshit. . . .

Kless explained that during this exchange, Williams "was refusing to be placed in the vehicle because he was adamant on having to watch the rest of the search."

We afford substantial deference to trial judges when evaluating their evidentiary determinations.  State v. Cole, 229 N.J. 430, 449 (2017).  We therefore review a trial court's evidentiary ruling for abuse of discretion.  State v. Green, 236 N.J. 71, 81 (2018).  We will reverse only where the court's ruling was "so wide of the mark that a manifest denial of justice resulted."  State v. Carter, 91 N.J. 86, 106 (1982); see also State v. J.A.C., 210 N.J. 281, 295 (2012).

Initially, Williams's reliance on Tung is misplaced.  In Tung, a recording of the defendant's police interrogation was played during his murder trial after the interrogating officer told the jury he believed defendant was lying in the video and was guilty of the charged crime.  Tung, 460 N.J. Super. at 87-89.  During the statement, the officer also asked whether defendant would consent to a search of his computer, but the defendant replied:  "I think I would speak to

my lawyer first about that." Id. at 84. The officer then asked for the defendant's consent to search his car. Ibid. But the "[d]efendant responded repeatedly that he wanted to consult his attorney first before agreeing to either search." Ibid. Undeterred, the officer again asked for consent to search the defendant's computer, stating: "[I]f you had nothing to hide . . . why wouldn't you let me look in your computer." Ibid. The officer also commented that the defendant answered his questions "like a person who's not being truthful." Id. at 85.

We reversed the defendant's convictions on two grounds. We held it was plain error to admit the defendant's statements, which repeatedly referenced his rights to consult with counsel and refuse to consent to a search of his computer and automobile. Id. at 99. We were persuaded that "the court did not give a limiting instruction to the jury that it could not consider [the] defendant's refusal to consent as evidence of guilt." Ibid. We also found the court erred by admitting the officer's trial testimony, which suggested his experience and specialized training enabled him to determine that the defendant was lying. Id. at 103.

Unlike the police in Tung, the officers in this case were not interrogating Williams or seeking his consent to search. Instead, when the officers explained their use of the canine officer, Williams immediately protested the search.

31

Stated another way, Williams's statements were not the product of police questioning; they were made in response to police action. The State argued Williams's unsolicited protestations of the search, followed shortly by his flight, evidenced his knowledge of the presence of the handgun in the Nissan.

Moreover, the State's closing argument focused not on Williams's statements but rather on his conduct while the search was occurring, just before he ran from the scene. The prosecutor summarized that conduct:

> We . . . know Jamire Williams does not run from the marijuana. Because we see it on the body camera. We heard it from the testimony of the officers. That bag [of marijuana] was put up on top of that car and he didn't move. He was patted down and he didn't move. When that canine dog [is] in that back seat is when [Williams] lost control because he knew what was going to be found. . . .
>
> He runs, they are placing him in the back of the police vehicle, and he is still adamant about seeing that search. Why? What is the logical reason for that?
>
> [The canine] found the marijuana. It's not [Williams's] car . . . . What does he care if it's being searched? He doesn't know what's underneath the seat. Why does he care? Common sense ladies and gentlemen. Circumstantial evidence. Think about it.

Immediately after making these comments, the prosecutor referenced the model jury charge on flight, explaining "flight is consciousness of guilt." See Model Jury Charges (Criminal), "Flight" (rev. May 10, 2010). The prosecutor

argued "Williams tried to distance himself from that gun by running." Neither the prosecutor nor the trial judge told the jury that Williams's statements protesting the search could be viewed as consciousness of his guilt.

Nevertheless, to have avoided any reference whatsoever to Williams's spontaneous invocation of his rights regarding the search – whether or not he was correct about his rights under the Fourth Amendment – the video footage should have been played without the audio, as Kelly argued before the trial judge. Doing so would have permitted the State to advance exactly the same argument without any reference to Williams's invocation of his rights.[8] Because the officers' statements were introduced to demonstrate Williams's conduct – and the State's references to those statements in summation were tied to Williams's flight from the scene after the canine unit entered the car – we nonetheless are satisfied any error was harmless under the circumstances presented here. R. 2:10-2.

---

[8] Additionally, the opinions expressed by the officers concerning the legality of the search were not relevant to the jury's consideration of the charges. Although not requested by the parties, the judge's limiting instruction on defendants' oral statements, issued before the body camera recordings were played for the jury, should have included that warning.

V.

In point V, Williams argues he was denied a fair trial because the State failed to provide transcripts of the oral statements made by him, Kelly, and the officers that were recorded by the officers' body cameras. We disagree.

We begin by reviewing the provisions of the discovery rule implicated by Williams's contentions on appeal. Rule 3:13-3(b)(1)(B) pertains to a defendant's statements, requiring the State to produce

> records of statements or confessions, signed or unsigned, by the defendant or copies thereof, and a summary of any admissions or declarations against penal interest made by the defendant that are known to the prosecution but not recorded. The prosecutor also shall provide the defendant with transcripts of all electronically recorded statements or confessions by a date to be determined by the trial judge, except in no event later than 30 days before the trial date set at the pretrial conference.
>
> [(Emphasis added)].

Rule 3:13-3(b)(1)(G), governs the statements of co-defendants and witnesses, requiring the state to produce the

> record of statements, signed or unsigned . . . which are within the possession, custody or control of the prosecutor and any relevant record of prior conviction of such persons. The prosecutor also shall provide the defendant with transcripts of all electronically recorded co-defendant and witness statements by a date to be determined by the trial judge, except in no event later

34

than 30 days before the trial date set at the pretrial conference, but only if the prosecutor intends to call that co-defendant or witness as a witness at trial.

[(Emphasis added).]

The State has a "continuing duty to provide discovery pursuant to this rule." R. 3:13-3(f). Rule 3:13-3(f) vests in courts the ability to take remedial action when a party fails to comply with the rule, including a continuance of trial, barring the statement, or such other appropriate relief. "A court's failure to take appropriate action to remedy a discovery violation can implicate the defendant's right to a fair trial." Smith, 224 N.J. at 48. That right to a fair trial requires a "meaningful opportunity to present a complete defense." Ibid.

With those rules in view, we turn to defendants' arguments before the trial judge. Just prior to trial, Kelly filed a motion for relief pursuant to Rule 3:13-3(b)(1)(G), contending the State failed to provide the transcripts of the body camera footage and motor vehicle recordings. Citing unpublished decisions, Kelly noted the State has produced transcripts in other matters. Williams orally joined the motion during the hearing; he did not cite Rule 3:13-3(b)(1)(B). The prosecutor countered that the discovery rules did not apply to the verbal exchanges captured on the body cameras because they were not "formal"

statements. She noted defense counsel never requested transcripts of the recordings.

The trial judge denied defendants' motion, finding the State had provided the recordings "early on as part of its discovery" and "Kelly never moved over the course of over eighteen months, until literally the eve of trial, to compel a production of transcripts."[9] The judge noted, Kelly's pretrial memorandum – executed four months prior to trial – indicates: "All pretrial discovery is complete." Noting the absence of published opinions requiring the State to provide transcripts of body camera videos, the judge concluded the State did not violate Rule 3:13-3(b)(1)(G).

"A trial court's resolution of a discovery issue is entitled to substantial deference and will not be overturned absent an abuse of discretion." State v. Stein, 225 N.J. 582, 593 (2016). We therefore "generally defer to a trial court's resolution of a discovery matter, provided its determination is not so wide of the mark" or a mistake of law. State in the Interest of A.B., 219 N.J. 542, 554 (2014).

---

[9] Kelly filed a formal motion; the judge granted Williams's oral application to join the motion during the hearing.

To date, no published case has addressed whether subsections (d) and (g) apply to body camera footage. Arguably, the statements captured on the body camera footage fall within the definition of "electronically recorded" statements under both subsections of the discovery rule. However, even if the discovery rules apply to the oral statements at issue, we discern no abuse of discretion in the judge's decision. Williams was not prejudiced by the State's noncompliance. The body camera footage was provided well in advance of trial, and portions were played at the suppression hearing seven months prior to trial. Thus, Williams was in receipt of the recordings and has not demonstrated how the purported error prejudiced his "opportunity to present a complete defense." Smith, 224 N.J. at 48. Notably, Williams never requested a Driver[10] hearing or claimed the recordings were inaudible or incomplete. In the absence of direction and the lateness of the request, we find no abuse of discretion.

## VI.

Finally, we turn to defendants' excessive sentencing arguments, recognizing our review is guided by a deferential standard. See State v.

---

[10] State v. Driver, 38 N.J. 255 (1962). During a Driver hearing, the trial court determines the admissibility of a sound recording, considering several factors including whether any changes, additions, or deletions have been made to the recording. Id. at 287.

Trinidad, 241 N.J. 425, 453 (2020); State v. Fuentes, 217 N.J. 57, 70 (2014). Appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record." State v. Case, 220 N.J. 49, 65 (2014). This court

> must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

## A. Williams's Sentence

After granting the State's application for a mandatory extended term under N.J.S.A. 2C:44-3(d) (second offender with a firearm), the trial judge appropriately found aggravating factors: three (the risk of reoffending); six (the extent of the defendant's prior record); and nine (general and specific deterrence). See N.J.S.A. 2C:44-1(a)(3), (6), and (9). Citing defendant's lengthy juvenile and criminal record, which began at age nine, the judge noted Williams "was afforded numerous probationary terms as a juvenile and violated probation on at least six occasions." As an adult, Williams was convicted

38

previously of a Graves Act offense. Noting defendant's present conviction involved the possession of a "a loaded, cocked handgun," the judge acknowledged the "very serious problem of gun violence" locally and nationally.

Referencing the presentence report, the judge noted Williams acknowledged membership in a particular sect of the Bloods street gang, but the judge declined to find aggravating factor five ("substantial likelihood that the defendant is involved in organized criminal activity"). See N.J.S.A. 2C:44-1(a)(5). The judge concluded the aggravating factors preponderated over the non-existing mitigating factors.

On appeal, Williams challenges only the trial judge's assessment of aggravating factor nine, claiming the judge gave undue weight to "general deterrence." Having considered defendant's contentions in view of the applicable law, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). The judge's findings were appropriately grounded in the record.

## B. Kelly's Sentence

After granting the State's application for a discretionary extended term as a persistent offender under N.J.S.A. 2C:44-3(a), the trial judge found

aggravating factors: three, six,[11] and nine. As evidenced by the court's recitation of Kelly's criminal background – which included three convictions for unlawful possession of a weapon since 2007 – there was abundant evidence in the record to support the court's imposition of a sentence within the extended range. Indeed, eight days after he was released from prison on a weapons offense, Kelly committed the present gun offense.

Kelly acknowledges his criminal record makes him eligible for a discretionary extended term. However, he claims the trial judge: (1) failed to consider his "offense was as mild and unremarkable as unlawful constructive possession of a weapon can be"; and (2) only considered a sentence within the extended-term range. We find no merit in defendant's first argument, R. 2:11-3(e)(2), but conclude a remand is required under the Court's decision in Pierce.

As noted by defense counsel during Kelly's sentencing hearing, because Kelly qualified as a persistent offender pursuant to N.J.S.A. 2C:44-3(a), his sentencing exposure was a term of imprisonment between five and twenty years.

---

[11] The oral pronouncement of sentence clearly reflects that the judge found aggravating factor six, although Kelly's judgment of conviction does not reflect that aggravating factor. See State v. Rivers, 252 N.J. Super. 142, 147 n.1 (App. Div. 1991); State v. Pohlabel, 40 N.J. Super. 416, 423 (App. Div. 1956) (recognizing the oral pronouncement is "the true source of the sentence" whereas the creation of the JOC is "merely the work of a clerk").

A-5229-18

N.J.S.A. 2C:43-6(a)(2); N.J.S.A. 2C:43-7(a)(3). However, the judge recited Kelly's sentencing exposure thusly: "Because the defendant satisfies N.J.S.A. 2C:44-3(a), he is eligible to be sentenced under N.J.S.A. 2C:43-7(a)(3), to a term of imprisonment between ten and twenty years, as he was convicted of a second-degree crime." The judge then imposed a fifteen-year prison sentence under the Graves Act.

In Pierce, the Court provided guidance for sentencing defendants pursuant to the persistent offender statute. Relevant here, if the trial court determines the defendant is eligible for an extended term as a persistent offender, "the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." 188 N.J. at 169. How a court chooses to sentence within that range "remains in the sound judgment of the court – subject to reasonableness and the existence of credible evidence in the record to support the court's [determinations] of aggravating and mitigating factors." Ibid.

In the present matter, because we are not satisfied the trial judge considered a sentence that included the lower end of the ordinary range of a second-degree crime, the sentence imposed may have been higher than it might otherwise have

been. Therefore, we believe Kelly is entitled to resentencing on count one within the range established by Pierce.

Affirmed, but remanded only for Kelly's resentencing on count one consistent with the Court's holding in Pierce. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5229-18